

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

Nos. 04-12-00153-CR & 04-12-00154-CR

Robert Eugene **SHEEDS**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 216th Judicial District Court, Bandera County, Texas
Trial Court Nos. CR-11-082 & CR-11-083
Honorable N. Keith Williams, Judge Presiding

Opinion by:   Luz Elena D. Chapa, Justice

Sitting:      Catherine Stone, Chief Justice
              Marialyn Barnard, Justice
              Luz Elena D. Chapa, Justice

Delivered and Filed:  September 11, 2013

AFFIRMED

Robert Eugene Sheeds, Jr. appeals the denial of his pretrial motion to suppress evidence that sheriff's deputies found during a search of a bedroom in which he was sleeping. After the denial, Sheeds pled guilty to two counts of possession of chemical precursors with the intent to manufacture methamphetamine, and he was sentenced to six years' imprisonment. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.124(a)(2) (West 2010). He contends the deputies violated the Fourth Amendment because they did not have a warrant and did not obtain consent from someone with the authority to consent to the search. We affirm.

BACKGROUND

The State called two of the three deputies who conducted the search to testify at the suppression hearing. Bandera County Sheriff's Department Deputy Kasey Young testified that on the night of the search he was attempting to apprehend a parole violator known as Ricky Gay. Deputy Young had been informed that Gay could be located at a certain address and drove a red Toyota car. At that time, the deputy had never met Gay and did not have a photograph of him. He drove to the address, as did Corporal Nowlin and Deputy Christopher in another vehicle.

When Deputy Young arrived at Gay's alleged location, he saw a man exit the residence through a side door and walk down the driveway. Deputy Young made contact with him, informed him that he had a warrant for Ricky Gay's arrest, and asked whether Gay was at the property. The man replied that Gay had been at the residence, but he believed Gay had just left. Deputy Young testified he asked the man for permission to search the residence to ensure Gay was not inside, and the man said "knock yourself out." Corporal Nowlin, who had arrived as Deputy Young was talking with the man, testified that he asked the man whether he lived at the residence; the man initially said he did not and then said he did. Corporal Nowlin also testified he heard Deputy Young ask the man whether anyone else was inside the residence, and the man replied that Ed was inside. He also heard the man consent to the search by saying "knock yourself out."

As Deputies Young and Christopher approached the door to search the residence, the man stopped them so he could restrain a pit bull that was on the other side of the door. The deputies proceeded to search the residence. Deputy Young had no more contact with the man, but Corporal Nowlin stayed outside and asked him for identification. The man produced a Texas identification card (falsely) identifying himself as a Fred Allen Christa. Corporal Nowlin checked with his dispatcher and determined there were no warrants for "Christa." He testified the picture on the identification card resembled the man standing before him. Corporal Nowlin stayed outside with

"Christa" until he heard raised voices coming from inside the residence; he instructed "Christa" to remain where he was and went inside to assist the other deputies. Corporal Nowlin did so without realizing "Christa" was indeed Ricky Gay.

Corporal Nowlin found the other deputies on the second floor of the residence talking with a man identified as Ed Gould. The officers continued to search until Corporal Nowlin and Deputy Christopher came to a room under the stairs. The door was closed, but Deputy Christopher opened it, entered without knocking, and saw Sheeds and his wife sleeping on a mattress on the floor. He recognized Sheeds and arrested him because he knew Sheeds had an active arrest warrant. Corporal Nowlin observed a syringe on top of the contents of a purse and what he thought were the components of a methamphetamine lab in the room.

The trial court made findings of fact and conclusions of law. The following findings of fact are relevant to the issue before us:

6. Deputies Christopher, Nowlin and Young arrived at the residence on the evening [sic] at about 17:50, and observed a red Toyota Celica parked to the side of the residence.

7. Deputy Young saw a person walk out of the residence and approached him.

\*\*\*

10. Deputy Nowlin asked [Gay] if he was living at the residence, and [Gay] replied that he had been staying there.[1]

\*\*\*

12. Deputy Young asked [Gay] if anyone was in the residence and [Gay] replied just Ed.

\*\*\*

14. [Gay] gave permission to Deputies Young and Nowlin to enter the residence that evening.[2]

\*\*\*

---

[1] Sheeds claims finding 10 does not accurately reflect the Deputy Nowlin's testimony about Gay's response. The deputy testified Gay initially said he did not live at the residence but then said he did. The finding is a reasonable interpretation of Deputy Nowlin's testimony.

[2] Sheeds claims finding 14 is erroneous because it implies both deputies were outside questioning Gay together. The record shows both deputies questioned Gay together for at least some time. The finding is supported by the record.

17. Deputies Young and Nowlin announced their presence several times in the residence before finding a person upstairs in the residence, whom they identified as Edward Gould (hereinafter referred to as Gould).

18. Gould did not ask any of the deputies to leave the residence.

19. Upon coming back downstairs, Deputies Christopher, Young, and Nowlin noticed a hallway and a room under the stairs.
***
21. Deputy Christopher opened the door and entered the room.
***
23. Deputy Nowlin entered the room announcing his presence and found a female, identified as Alexis Sheeds, and a male, identified as Robert Eugene Sheeds, Jr.

24. Deputy Nowlin contacted dispatch and was informed that Robert Eugene Sheeds, Jr. had two active warrants for his arrest.

The following conclusions of law are also relevant to the issue before us:

1. [Gay] was a resident of the residence.

2. [Gay] voluntarily gave consent to the deputies to enter the residence.
***
4. [Gay] had apparent authority to consent to the search of the residence for Gay based upon an objective review of the totality of the facts known to the deputies on the evening and widely shared social expectations as discussed in *Limon v. State*, 340 S.W.3d 753, 756–7 [sic] (Tex. Crim. App. 2011).

5. Deputies Nowlin, Young, and Christopher reasonably believed that [Gay] had authority or control over the residence because [Gay] exited the residence at night from a side door.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010). When the trial court makes findings of fact, we afford almost total deference to its interpretation of the evidence and resolution of conflicts in the evidence, especially when they rest on evaluations of credibility and demeanor. *Id.*; *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). But the court's determination of actual or apparent authority is reviewed de novo as a mixed question of law and fact. *Limon v. State*, 340 S.W.3d 753, 757 (Tex. Crim. App. 2011).

## APPARENT AUTHORITY

In order for a warrantless consent search to withstand Fourth Amendment scrutiny, the consenting individual must have actual or apparent authority over the premises or item to be searched. *See id.* at 756–57. The State bears the burden of proving by a preponderance of the evidence that an individual had authority to consent to a search, whether actual or apparent. *Id.* at 757.

The test for apparent authority is whether an officer reasonably believes that an individual has authority over the premises to be searched under the facts known to the officer. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990); *Limon*, 340 S.W.3d at 756. In applying the test, we are careful not to apply it so strictly that we place too heavy a burden on law enforcement officers. *Riordan v. State*, 905 S.W.2d 765, 771 (Tex. App.—Austin 1995, no pet.). However, the law does not permit officers "to proceed without inquiry into ambiguous circumstances or to always accept at face value the consenting party's apparent assumption or claim of authority to allow the contemplated search." *Id.* Ultimately, the reasonableness of an officer's belief hinges on "widely shared social expectations." *Limon*, 340 S.W.3d at 756–57.

## APPLICATION

The State was required to prove by a preponderance of the evidence that the deputies searching the residence reasonably believed Gay had apparent authority over the entire residence. Three facts support the conclusion that the deputies' belief of authority was reasonable. First, Gay's use of the side door implied some degree of familiarity with and control over the residence. Second, he showed an even greater degree of familiarity and control by disclosing the existence of the pit bull and volunteering to restrain it as the deputies went inside. Finally, Gay stated that he was staying at the house, which implied he had authority as a resident to consent. We are persuaded that all three facts together would allow a reasonable officer to conclude, consistent with widely

held social expectations, that Gay had a relationship to the residence that would allow him to consent to a search. *See id.*

Relying on *Riordan*, Sheeds argues the deputies created ambiguous circumstances by arriving at the residence without any identifying information for Gay. In *Riordan*, the person from whom law enforcement officers were seeking consent to search made affirmative statements that she did not live on the premises to be searched and that she was only a babysitter. 905 S.W.2d at 772. Those statements created ambiguous circumstances that officers were required to clarify before they proceeded to search. *Id.* In this case, Gay told the officers he was staying at the residence. He implied that he had authority over the residence, instead of a lack of authority, and we therefore distinguish *Riordan* from this case.

## CONCLUSION

We affirm the judgments of the trial court.

Luz Elena D. Chapa, Justice

Do Not Publish